# In Re: North Chicago Police Department

## Crystal Phillips
### March 13, 2012

**MERRILL CORPORATION**

LegaLink, Inc.

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

In Re: North Chicago Claims
_____/

SWORN STATEMENT OF CRYSTAL PHILLIPS

Taken at the New York Hotel & Casino

On Tuesday, March 13, 2012

at 12:45 p.m.

at 3790 Las Vegas Boulevard, South

Las Vegas, Nevada

Reported by: Blanca I. Cano, CCR No. 861, RPR

Page 2

```
 1   APPEARANCES:
 2   COLLISON & O'CONNOR, LTD.
     1894 Techny Court
 3   Northbrook, Illinois 60062
     BY:  KEVIN O'CONNOR, ESQ.
 4   BY:  MURIEL COLLISON, ESQ.
     (847) 272-8750
 5
 6
                    * * * * *
 7
 8
                      INDEX
 9
     WITNESS                         PAGE
10   Crystal Phillips
         Examination by Mr. O'Connor   3, 94
11       Examination by Ms. Collison      84
12
13
                    * * * * *
14
15
                    EXHIBITS
16
     NUMBER                         MARKED
17
      1   Memorandum of Understanding    3
18        Between the City of North Chicago
          and a Minority Coalition
19
20
21
22
23
24
25
```

Page 3

```
 1      CLARK COUNTY, NEVADA, TUESDAY, MARCH 13, 2012;
 2               12:45 P.M.
 3                 -oOo-
 4
 5          (Exhibit 1 was marked.)
 6
 7            CRYSTAL PHILLIPS,
 8   was called as a witness, and having been first duly
 9   sworn, was examined and testified as follows:
10
11              EXAMINATION
12   BY MR. O'CONNOR:
13     Q.  Please state your name for the record.
14     A.  Crystal Phillips.
15     Q.  Let the record reflect this is the sworn
16   statement of Crystal Phillips taken here in Las Vegas on
17   today's date.
18        You've been sworn and you're under oath and you
19   understand what that means, correct?
20     A.  Yes.
21     Q.  Ms. Phillips, can you tell me what -- I want to
22   ask you a little about your background.
23        You're a former police officer with North
24   Chicago Department, correct?
25     A.  Yes.
```

Page 4

```
 1     Q.  Can you just tell us a little bit of your
 2   history, when you started with the department and how
 3   you worked up the ranks?
 4     A.  I started in 1990, June of 1990, as a patrol
 5   officer.  Basically just patrolling the road, going to
 6   initial calls.
 7        And in 1993, I believe, I went into
 8   investigations which was a connection with patrol.  What
 9   we do is follow up on cases that the patrol officers
10   couldn't immediately take care of.
11        If there was a complaint and the person -- or
12   the alleged offender was not on location, they couldn't
13   locate him in a certain amount of time, we would pick
14   the case up the next day and follow up on it:  Obtained
15   warrants if necessary, get statements from everybody,
16   things like that.
17        In 1999 I made the rank of sergeant.  I went
18   from there to midnight shift.  I was there for three
19   years and then -- three or four years and then I went
20   back down in the administration office as administrative
21   sergeant which was in connection with the assistant
22   chief of administration.  I was over the civilian
23   employees of records, dispatchers, things like that.
24        In 2005, I believe, or 2006, Chief Williams
25   retired.  The two assistant chiefs that was in that
```

Page 5

```
 1   department with him were no longer needed and I took the
 2   rank of assistant chief of administration.
 3     Q.  And in terms of the rank at North Chicago, what
 4   was the assistant chief?  Was that number two, was it --
 5     A.  It was second in command.  There was two of us.
 6   And because of Lieutenant Holderbaum who was also the
 7   other assistant chief, because of his time on, he
 8   outranked me.  When we went in there, the radio numbers
 9   were 300, 301, 302.  I was 302.  300 being the chief,
10   301 being Lieutenant Holderbaum.
11     Q.  And the simple numbers kind of set forth the
12   ranks?
13     A.  Yeah.  Radio numbers.
14     Q.  And when you -- by the time you were the
15   assistant, did you then become a lieutenant?
16     A.  During the course of my time as the assistant
17   chief, the test came up for lieutenant and I took the
18   test and passed and receive lieutenant even though I was
19   still being paid as a deputy chief.  I had the rank of a
20   deputy chief also.
21     Q.  And when did you leave the department?
22     A.  July 1st, 2011.
23     Q.  And did you leave on your own accord?
24     A.  Yes.
25     Q.  Since leaving in July, have you gone back into
```

Page 6

1  law enforcement or are you retired now?
2     A.  I'm retired.  No law enforcement.  Never.
3     Q.  How many years in law enforcement did you end
4  up having?
5     A.  Twenty-one years.
6     Q.  Before starting with North Chicago, did you
7  have any other positions, whether as a civilian or a
8  police officer, in any law enforcement capacity?
9     A.  No.
10    Q.  What's your highest level of education?
11    A.  High school.
12    Q.  In addition to high school, did you go through
13 the normal academy training before becoming a police
14 officer?
15    A.  Yes.
16    Q.  And then following that, did you receive
17 additional training over the years?
18    A.  Yes.  Through the police department.
19    Q.  And through the police department.
20        And did that training include schooling,
21 certain schooling related to being a sergeant, a
22 lieutenant prior to taking those exams?
23    A.  Once you -- no.  We take the test, once you
24 make the rank of sergeant then they'll send you to
25 Northwestern or whatever the school is called,

Page 7

1  Supervision of Police Personnel.  I went to that for two
2  weeks.
3         I also went to a ten-week class, School of
4  Staff and Command at Northwestern University which is
5  basically preparing you to run a police department.
6     Q.  And you received certificates --
7     A.  Yes.
8     Q.  -- upon completion of that?
9     A.  Yes.
10    Q.  And I would imagine over the years in your
11 position you received a number of other certificates in
12 certain training of investigating --
13    A.  Yes.
14    Q.  Probably numerous?
15    A.  Homicide, interviews, what is the -- School of
16 Interview and Interrogation Techniques, Breathalyzer
17 operator, field training officers.  A number of things.
18 Hazmat materials, Taser training, everything.
19    Q.  Okay.  Did you grow up in North Chicago?
20    A.  No.  I was born in Chicago.  When I was 12, we
21 moved to Harvey, Illinois and from there my mom moved to
22 North Chicago.
23    Q.  So then in your teenage years you lived in
24 North Chicago?
25    A.  I lived there for my junior year of high

Page 8

1  school.  I didn't like it and I moved back to Calumet
2  City with one of my sisters.  Ended up graduating from
3  there.
4     Q.  Then you decided to become a police officer
5  later on?
6     A.  No.  I went into the military.  Four years in
7  the Navy.
8     Q.  And what was your highest rank or what position
9  did you have in the military?
10    A.  I was E-4, petty officer, the year I got out.
11    Q.  Did you serve any time overseas?
12    A.  My first duty station was Guantanamo Bay, Cuba.
13    Q.  Was that during the active fighting times?
14    A.  No.  This was the early '80s.
15    Q.  Did you leave with an honorable discharge?
16    A.  Yes.
17    Q.  And then following the military, is that when
18 you started law enforcement?
19    A.  For a couple of years I worked at an insurance
20 company.  I stayed -- I was living in California, me and
21 my ex-husband.  I got homesick, came back home, applied
22 for North Chicago.
23    Q.  And you still have extended family that live in
24 North Chicago or the North Chicago area?
25    A.  Yes.

Page 9

1     Q.  You now live in Las Vegas?
2     A.  Yes.
3     Q.  And you've been out here since your retirement?
4     A.  Officially permanently in October, yes.
5     Q.  I want to ask you some questions in general
6  about some specific -- regarding your time in North
7  Chicago and some of the activities that went on there
8  and some of the instances you're aware of at various
9  times, okay?
10    A.  Okay.
11    Q.  And we've had a chance to talk just before we
12 started this recording to where I asked you what you
13 remembered and you've given me the opportunity to try
14 and refresh your memory on certain instances, what
15 happened, what was going on in the department when you
16 were there, correct?
17    A.  Yes.
18    Q.  I want to ask you first, we've marked as
19 Exhibit 1 Memorandum of Understanding Between the City
20 of North Chicago and Minority Coalition that happened --
21 tell you the document has the date of 2007.
22        I'm not going to ask you specifically about the
23 wording in the document at this point, but do you recall
24 that coming up when you were with the department, that
25 that issue was being presented or there was some issues

Page 10

1  going on in the department where this memorandum of
2  understanding came about?
3      A.  Yes.
4      Q.  And in general what caused the memorandum of
5  understanding to come about?
6      A.  I really can't say because there were a lot of
7  things that took place that I wasn't aware of.  I didn't
8  have the opportunity to go to any of those meetings that
9  took place concerning that, so I can't really comment on
10 that.
11     Q.  Did you know that it was involving certain
12 complaints by citizens and use of force where there was
13 people brought in and issues brought up that they wanted
14 to have some action taken in order to have more
15 community involvement?
16     A.  From what I was being told, yes.
17     Q.  And you were being told that by various people
18 in the department?
19     A.  Yes, sir.
20     Q.  When you mentioned -- you just mentioned that
21 you weren't involved in that.
22         What were your job duties as the assistant
23 deputy chief?  What were supposed to be your job duties,
24 I guess?
25     A.  The overall running of the police department on

Page 11

1  a daily basis.  I believe during that time frame, I
2  can't say for sure because of the date, there was two of
3  us at one point.
4         I was the assistant chief of administration and
5  there was an assistant chief there by the name of Walter
6  Holderbaum over operations.  I don't know if he took
7  part in it or if it was during his time frame.
8         I really wasn't privy to some of the things
9  that went on in operations when I was over
10 administration.
11     Q.  And when you were over administration, what
12 does that mean?
13     A.  I was basically in charge or our records
14 division, our dispatch division, vehicle maintenance
15 guy, and basically that's it.  I think animal ward.
16     Q.  Were you in any way involved with citizens'
17 complaints?
18     A.  No.
19     Q.  Did you ever have a different position than
20 being in the administrative position when you were the
21 assistant chief?
22     A.  When Assistant Chief Holderbaum retired, I was
23 given the position of assistant chief over operations by
24 Chief Newsome.
25     Q.  And when you were assistant chief over

Page 12

1  operations, what duties would that involve?
2      A.  I was basically told by him to focus on patrol
3  division because there were numerous complaints about
4  their behavior with the citizens.
5      Q.  And when you say numerous complaints about
6  their behavior with the citizens, did that range from
7  everything about disrespect to --
8      A.  Yes.
9      Q.  -- use of force, to all types of complaints
10 that were being lodged by citizens?
11     A.  Supposedly, yes.
12     Q.  And the reason he wanted you to look into
13 those -- or to focus on that was because of the on --
14 continuing problem that he was aware of going on?
15     A.  I would say so, yes.
16     Q.  What year were you over operations?
17     A.  I believe it was 2007.  I think that's the year
18 that Holderbaum left.
19     Q.  And that's why when you talk about this
20 agreement, you're saying it was somewhere right around
21 that time that you would have taken control of
22 operations which is when this shift occurred?
23     A.  Yes.
24     Q.  Okay.  And normally in your job duties, would
25 you be a part or -- would you have expected to be a part

Page 13

1  of the memorandum of understanding if there's an
2  understanding going in the --
3      A.  I would have expected it, yes.  I inquired
4  about it, but I was told that -- by Chief Newsome that
5  him and Sergeant Wilson, I believe, at the time would be
6  the ones that would be attending the meetings.
7      Q.  Were you taken aback by that?
8      A.  Yes.
9      Q.  Tell me, did you get an impression from your
10 feeling, why you were being kind of left out of the loop
11 on those kinds of issues?
12     A.  Well, I don't know if he was afraid that I
13 would say that I did believe some of the accusations
14 that were being made were probably true.  I don't know
15 if he was afraid for me to speak my mind about the
16 things that I felt was going on and wasn't correctly
17 dealt with, should I say.
18     Q.  Okay.  And the things that you're talking about
19 is the conduct of certain officers?
20     A.  Yes.
21     Q.  Okay.  And that conduct related to how they
22 were treating the citizens, whether it was by verbal --
23     A.  Or --
24     Q.  -- or physical force?
25     A.  Yes.

Page 14

1  Q. And had you at that time in 2007 made it known
2  to the police chief -- it was Chief Newsome at the time?
3  A. When I took over operations, yes, I did tell
4  him -- prior to me taking over, there was an event where
5  there would be complaints coming into the mayor's office
6  and his secretary would fax the complaints downstairs to
7  our office.
8      And numerous times I've seen where our
9  secretary would place several of those complaints on at
10 the time Lieutenant Holderbaum -- Deputy Chief
11 Holderbaum's desk to be addressed. But once again, I
12 wasn't a part of operations, so I really don't know how
13 those things were handled.
14     When I came into the office, those complaints
15 stopped basically. As soon as I took over operations, I
16 didn't really receive too many faxes from upstairs
17 regarding officers' behavior.
18 Q. Let me ask you, when you say "those complaints
19 stopped," they stopped coming to you?
20 A. That I'm aware of, they stopped coming to me.
21 Q. And you were aware of the fact that the
22 previous director of operations or the chief of
23 operations -- assistant chief of operations I guess is
24 the right word -- that those complaints were going to
25 him?

Page 15

1  A. They were coming pretty frequently.
2  Q. And when you took over the position, for
3  whatever reason the complaints were still coming in
4  upstairs but they were bypassing your office and going
5  somewhere else?
6  A. I can't say if they were still coming in. I
7  just know that I rarely got complaints from the mayor's
8  office.
9      Every blue moon I would get one, and most of
10 those would be verbal complaints regarding verbal
11 respect or something that was maybe a person's vehicle
12 was being towed or something and they didn't feel it
13 should have been towed, but it was nothing physical.
14 Q. Were you aware that people were still making
15 complaints based on your position?
16 A. Later. I would find out later that complaints
17 were still coming in, yes.
18 Q. Give me -- in 2007, can you tell me on average
19 how many complaints you were aware of that were -- you
20 may have found out later, and I understand that -- how
21 many were coming in on a week? And I understand it
22 would vary from week to week.
23 A. You would probably get maybe three, four, five
24 complaints a week. Would I get them? Some I may, some
25 I may not. Why? I can't say.

Page 16

1  Q. At three or four or five complaints a week, if
2  we do the math on that --
3  A. That's pretty frequently.
4  Q. You're talking about 150 to 200 complaints a
5  year?
6  A. Yes.
7  Q. Okay. And when there were complaints that
8  would come in, was the policy or procedure in North
9  Chicago that those complaints were supposed to be
10 documented or written in some form?
11 A. If there's -- yes.
12 Q. In other words, if a citizen complains, they
13 fill out a form?
14 A. Yes. We were not allowed to turn any citizen
15 away from a complaint, yes.
16 Q. In fact, the department rules were that if a
17 citizen comes in and complains, you would request or ask
18 that they put it down in writing so there would be
19 documentation?
20 A. Yes. They were given citizen complaint forms
21 that they were allowed to fill out. And then the
22 practice was that the shift commander that was over that
23 particular officer would look into that complaint and
24 then give their findings to the chief's office.
25 Q. And in a sense, once you took over your

Page 17

1  position, the job duties of looking over those
2  complaints that would come in were essentially taken
3  away from you and taken on by the chief?
4  A. Some of them, yes.
5  Q. Okay. He would still handpick certain ones
6  that he would allow you to investigate?
7  A. I can't say that. I can only say what would
8  come to me that I would choose to deal with. I mean,
9  that I would -- I can only deal with the ones that came
10 to me. If there were other complaints that came in,
11 they could have bypassed me and went straight to the
12 chief's office. I can't say for sure. I believe it
13 happened like that, but I can't say for sure.
14 Q. In other words, you don't know if it was the
15 chief that made the directive that it bypass you or it
16 could have been one of the sergeants or lieutenants that
17 were reviewing it that made an election to bypass you?
18 A. Right. Or if they even sent them down to us.
19 Q. Or they --
20 A. Some of them they would handle themselves
21 depending on what the level of the complaint was. They
22 could handle them at their own discretion if it was
23 nothing too serious. Some they would send through; some
24 they would say it was not even worthy of coming through.
25 Q. At the time when -- even the complaints you saw

Page 18

1  coming through about specific officers, was there a
2  pattern or practice with certain officers that brought
3  things to your attention or concern to your attention?
4      A.  Yes.
5      Q.  And can you recall specific officers where that
6  pattern or practice alerted you or was catching your
7  eye?
8      A.  Yes.  There was certain officers whose name
9  would come up pretty frequently, yes.
10     Q.  And which ones were those?
11     A.  Don't quote me, it's been a while.  Bogdala was
12 one.  We had a lot of complaints about him, his
13 aggression towards the citizens.  Will, his mannerism;
14 Geryol, his verbalization.  It could be a list of them
15 but I can't say verbatim.  Cecala, during that time he
16 was in an administrative position so he didn't get too
17 many complaints.  We would get some under his direction.
18         Sometimes when a shift commander would go on
19 leave or vacation or called in, we would have to use
20 Sergeant Cecala or Sergeant Wilson who were in our
21 administration office to go on the road and cover the
22 shift.  And quite a few times when Cecala would be on
23 the road, there would be a complaint of excessive force
24 coming in --
25     Q.  When you were looking at the --

Page 19

1      A.  -- regarding officers.
2      Q.  -- complaints of force or excessive force
3  coming in, did there seem to be a pattern that would
4  occur more frequently on a day shift, night shift,
5  afternoon shift?
6      A.  Sometimes second shift, most frequently it
7  would be midnight shift.
8      Q.  Okay.  And there was one officer you haven't
9  named, Officer Diez?
10     A.  Yes.
11     Q.  Was he one of the ones where you would have
12 frequent things coming through?
13     A.  Diez was a hotheaded person.  Initially when he
14 first started, he was a little hotheaded, but he calmed
15 down quite a bit.  And towards the end I guess got a
16 little aggressive, his behavior.
17     Q.  And when you talk about his behavior would get
18 aggressive, are you saying the inability to maintain his
19 temper during a heated situation?
20     A.  Well, complaints from citizens would say he
21 would go overboard sometimes.
22     Q.  Over --
23     A.  You have to understand, too, depending on the
24 area that Diez was in, there wasn't much that I would
25 get on him.  At one point for a while there, a couple of

Page 20

1  years, he was over in our drug unit.  Chief Newsome was
2  responsible for him, he chose to be in our drug unit.
3  So if any complaints came in on Sergeant Diez, it would
4  go to Chief Newsome.
5      Q.  In terms of these officers that you've named
6  specifically, did you address your concerns with the
7  chief regarding those officers?
8      A.  Yes.  Couple of times I told him that he needed
9  to start doing some discipline because if he didn't, it
10 was going to get out of control.
11     Q.  And what did you -- in your words, what did you
12 interpret by -- what did you -- what did you think --
13 what was it going to lead to or what was the "out of
14 control" in your mind?
15     A.  They were going to get to the point where they
16 were going to get too aggressive with the citizens to
17 the point where something serious was going to happen.
18     Q.  Whether somebody was going to get a serious
19 injury or death or --
20     A.  Exactly.
21     Q.  And had you had knowledge of some instances
22 that had happened where people died under -- being --
23 where there were occurrences with officers where there
24 was force used and actually citizens died?
25     A.  I can't say.  We did have three officers that

Page 21

1  killed three young men, but I never had the privilege of
2  reviewing the case files.  All I could go by was the
3  rumors on certain ways those cases were handled.  I
4  never had the privilege.  The chief never showed me the
5  case file.
6      Q.  Did it happen at a time when you were the --
7      A.  Assistant chief of operations.
8      Q.  Did anyone really look at or investigate those
9  situations and --
10     A.  Supposedly it was looked at by our internal
11 affairs sergeant, Sergeant Richard Wilson.  All I can
12 say is I was never privy to the actual outcome or the
13 privilege of looking at any of those case files, so...
14     Q.  Okay.  Was there any -- when you brought up to
15 the chief, you know, your concerns or your issues and
16 you said numerous times, did you see any actions that he
17 took to try and rectify those situations?
18     A.  No.
19     Q.  What was his general response?
20     A.  He'll take care of it, he'll look into it.  I
21 would recommend that he have Sergeant Wilson, internal
22 affairs, look into certain situations and he would say
23 he would take care of it.  If it happened, I don't know.
24 He would never come back to me and say one way or the
25 other whether he did anything about it.

Page 22

1   Q. In terms of the memorandum of understanding
2   which we marked as Exhibit 1, you've had a chance to
3   look at it now, correct?
4   A. Yes.
5   Q. And there was a number of provisions in here, 1
6   through 9, where it's talked about that the City of
7   North Chicago agreed to implement certain procedures as
8   a result of this memorandum or agreement, correct?
9   A. Yes.
10  Q. The first is a transparent complaint process.
11      Are you aware when you were there of a
12  transparent complaint process being set up?
13  A. Well -- no. I'm not aware of it, no. I know
14  we had the forms for the citizens to fill out a
15  complaint, but other than that, no, I don't know if they
16  had a committee or anything set up for it.
17  Q. All right. And when you talk about a
18  transparent complaint process -- in other words, if
19  somebody wanted to make a claim against an officer, the
20  way you knew it operated, did they have to put their
21  name on it? You couldn't just make a complaint
22  anonymously?
23  A. Right. They would have to put their name on
24  it. Depending on what the complaint was, we needed
25  their information in order for our internal affairs

Page 23

1   officer to get in touch with them. So there was
2   specific information that we would request from them.
3   Q. And you're not aware of anything being
4   disseminated to all the city residents telling them we
5   have this new process to help you lodge complaints if
6   you have a problem with an officer?
7   A. No.
8   Q. Okay. Then they talk about a monthly citizens'
9   concern summary -- about a monthly concern summary to
10  track incidents of force, types of force used, verbal
11  abuse, and to create a database in the internal affairs
12  division.
13      Are you aware of that ever happening?
14  A. No.
15  Q. Okay. And then it indicates with monthly
16  reports to the chief of police and the mayor in
17  accordance with North Chicago Police Department policy,
18  an appropriate action will be taken.
19      Are you aware, first of all, of any of the
20  monthly reports coming to the chief or the mayor as a
21  result of monthly citizen concern summaries?
22  A. Not of citizen concerns. We would get a weekly
23  report from the shift commanders on basically what
24  occurred, anything that was serious that may have
25  occurred from the shift regarding anything. It could be

Page 24

1   a bad accident, anything, but nothing about that, no.
2   Once again, I can't really comment on that. I wasn't a
3   part of that process.
4   Q. I understand.
5       You weren't aware that they were even doing
6   that or taking action on monthly citizen concerns or --
7   A. They could have but I just was not privy to
8   that.
9   Q. If there was a monthly citizens' concern, I
10  mean being involved in the community you would have
11  heard about it or expect --
12  A. I probably would have, yes.
13  Q. Recruitment of minority officers.
14      Was there a push in 2007 as a result of this
15  understanding that you saw that there was a large
16  recruitment to try to get minority officers?
17  A. Not that I'm aware of.
18  Q. Traffic stop study.
19      Are you aware that they were tracking and
20  monitoring on a monthly basis all the traffic stops?
21  A. Not that I'm aware of.
22  Q. Bilingual interpretation services.
23      Are you aware of that being --
24  A. Not that I'm aware of.
25  Q. Okay. The political retribution, political

Page 25

1   agendas such that people couldn't have retribution
2   against them if they didn't, you know --
3   A. Not that I'm aware of.
4   Q. Okay. Was there some -- was there some
5   political issues to where certain people were tied to
6   certain -- like whether it's the chief of police, the
7   mayor -- and it was a particular officer that you were
8   aware of that was -- that appeared to be going on in the
9   department?
10  A. Yeah. There was certain officers that I would
11  feel due to his relationship with him, they would get
12  away with certain things. If that's what you're asking.
13  Q. Yes.
14      Who were the ones that were closest either to
15  the police chief or the mayor that you were aware of?
16  A. He would deny it, but I could see Bogdala,
17  Will, Geryol. I found out a lot of things that went on
18  in my office from Geryol. Things that I should have
19  been first knowledge of. He would tell me things. So
20  it was quite a few of them.
21  Q. And when you say he would tell you a lot of
22  things, about what topics?
23  A. Just basic things. Geryol is one of our dog
24  handlers and he would just come in one day and he would
25  punch a card and say I got to do a walk-through at --

### Page 26

1  Zion bit. When did this happen? Didn't you know the
2  chief -- we've been set this up. He didn't tell you?
3  Things like that went on regular around there.
4     Q.  Things that you would think the second and/or
5  third in command like you were would be told before the
6  officers or sergeants that are out on the street?
7     A.  Yeah. Because if the dog is at the school and
8  he went out of control and it bit a kid, you know, I
9  would have to deal with that. You know what I'm saying?
10    Q.  Okay. Was there a creation of a police
11 advisory committee?
12    A.  Not that I'm aware of.
13    Q.  Cultural sensitivity training?
14    A.  Not that I'm aware of. If you want to talk
15 about diverse training, we've done diverse training. I
16 can't say if it was specifically done for that, I can't
17 say what time frame, but we have had that training at
18 that department.
19    Q.  How about police deescalation strategies for
20 safe street encounters that are used daily and then
21 reinforced during training?
22    A.  Not that I'm aware of.
23    Q.  Okay. Community outreach programs?
24    A.  Not that I'm aware of.
25    Q.  The last page of this document indicates a

### Page 27

1  number of names of people who would have signed off on
2  this agreement.
3     It included the chief of police, Michael
4  Newsome, correct?
5     A.  Yes.
6     Q.  And Sergeant Richard Wilson, you mentioned
7  internal affairs?
8     A.  Yes.
9     Q.  Was he also a deputy chief at the time?
10    A.  No. Just a sergeant.
11    Q.  Okay. And do you know why you wouldn't be
12 included as part of this agreement? Is there any good
13 reason, I guess I should say?
14    A.  I can't say, no. No.
15    Q.  Would part of your job duties as -- what you
16 had even over administration, if all of these committees
17 were set up that we've talked about here, these nine
18 different actions or whatever, it would have involved
19 you or your office?
20    A.  Yeah. There could have been a possibility
21 where Chief Newsome or Chief Holderbaum could have been
22 out of town and have certain things transpire and I
23 would have to take care of it so I should have been a
24 part of it, yes.
25    Q.  I wanted to ask you in terms of specific

### Page 28

1  instances.
2     You were aware of a certain instance involving
3  Van Alston?
4     A.  Yes.
5     Q.  How did you become aware of that instance?
6     A.  I received a call one night from Lieutenant
7  Richard Theis. His name is actually Anthony Richard
8  Theis. And he advised me that there was a traffic
9  infraction and there was a slight pursuit by a subject.
10 I can't quote him verbatim, it was a while ago.
11    And that when they initially made the stop,
12 they had to put the person into custody and he said when
13 he got there -- and like I said, I can't quote exactly
14 what he said, when they pulled the gentleman off the
15 ground, his eye looked pretty bad and he wanted to
16 report it because we might get some calls from the
17 hospital.
18    Sometimes when there's injuries that occur to
19 prisoners, we do get calls from hospitals and they want
20 to know who's going to pay the bill, whether it be us or
21 the actual offender.
22    I came in the next morning. I believe I saw
23 Sergeant Wilson first when I walked in and told him
24 about the situation, him being internal affairs. I let
25 him know that I was going to tell Chief Newsome and

### Page 29

1  recommend to Chief Newsome that that particular incident
2  be looked into because I wasn't comfortable with the way
3  Theis sounded on the phone.
4     Q.  Why is it that this complaint went through you,
5  because you had told me before a lot of these seemed to
6  bypass you?
7     A.  I can't answer that question. I don't know if
8  it's because Theis knew after viewing Mr. Van Alston
9  that it was going to be something pretty serious to come
10 up. I can't answer that question.
11    Q.  Did you know Mr. Van Alston before the
12 occurrence happened?
13    A.  I remember him over the years especially as a
14 patrol officer when I was out on the road. And in
15 investigations, every time I would see Mr. Van Alston,
16 he would compliment, hey, good job. I know you guys'
17 job is tough. He always complimented. He was a real
18 nice gentleman.
19    Q.  Nice citizen, good citizen in the community?
20    A.  Yes. I never had any problems with him.
21    Q.  Did you get a chance to see him that evening or
22 the next day?
23    A.  I saw a video, the photo of him, yes.
24    Q.  And when you saw the photo of him, what did you
25 notice?

Page 30

1    A.   It -- that his eye was pretty badly bruised.
2  It was pretty swollen.
3    Q.   One side of his face looked normal?
4    A.   Yes.
5    Q.   And the other side looked like he was beaten
6  pretty bad?
7    A.   Yes.  When Lieutenant Theis spoke the name, I
8  couldn't put the name to the face until I saw the
9  picture.  You meet a lot of people over the years and
10 some you remember.  And when I saw his face, I was like,
11 no, not him.  This is a real nice gentleman.  And it was
12 pretty sad for me.
13   Q.   And what did you do then at that point once you
14 saw the pictures of him?  Did you attempt to try and
15 locate any videos or any information that came?
16   A.   Actually, Sergeant Wilson brought the video to
17 me.  He immediately -- I wasn't thinking, because I got
18 a little upset after looking at the picture once I saw
19 who it was.  He immediately, I believe, went to the
20 squad cars and started pulling the different videos from
21 the shift that was driving the squads.
22   Q.   And did you get a chance to review that video?
23   A.   Yes, I did.
24   Q.   Based on what you observed in that video, did
25 you have the opinion that the conduct of the officers

Page 31

1  was inappropriate?
2    A.   Yes, very inappropriate.
3    Q.   And there was a number of officers involved,
4  correct?
5    A.   Yes.
6    Q.   And did you then bring your concerns to the
7  chief?
8    A.   Yes.
9    Q.   And it was Chief Newsome?
10   A.   Yes.
11   Q.   And when you brought your concerns to the
12 chief, did you ask him to look at the video?
13   A.   Yes.  We told him that he needed to look at the
14 video.  He was like, no, I don't want to see the video.
15 What do you mean?  You need to look at the video.
16 You're going to have to do some type of discipline.
17 This is ridiculous.  He kept saying, no, I don't want to
18 see it.
19       But some type of way, I don't know if it was by
20 accident or if it was on purpose, I can't say if it was
21 the same day or if it was a couple days later, I believe
22 we were in Wilson's office and Sergeant Wilson just put
23 the video on and he had no choice but to look at it.
24   Q.   And did you make any recommendations to the
25 chief as to the officers involved and what should

Page 32

1  happen?
2    A.   Verbally I told him that not only should it be
3  looked into by internal affairs, Sergeant Wilson, also
4  told him that not only should Diez receive some
5  discipline, but the officers that were standing there
6  and didn't stop Diez should receive discipline.  But
7  that was verbal recommendation.
8    Q.   And there was also some -- you were aware of
9  the fact that there was some Tasing that went on with
10 him as well but you couldn't see it in the video?
11   A.   Yes.  I was later told that he was Tased, yes.
12   Q.   And in terms of that, you wanted all of that to
13 be investigated for the appropriate action?
14   A.   Yes.
15   Q.   But did the chief say whether he was going to
16 do that investigation or look into it?
17   A.   He said he was going to have Sergeant Wilson
18 look into it, yes.
19   Q.   And did you make any specific recommendations
20 that all of the officers involved receive some level of
21 discipline?
22   A.   When they got done with the case -- I never had
23 the opportunity to view the case file.  Chief Newsome
24 chose to deal with it on his own.  He did at one point
25 prior to the outcome of the investigation, he asked me

Page 33

1  to go to our attorney's office, Chuck Smith, with him.
2        We went to Chuck Smith's office.  He said that
3  he wanted to know what my recommendation would be if I
4  had the privilege to make it for Sergeant Diez.  And we
5  looked at the video while at Chuck's office and I said
6  with him being a sergeant, I would recommend no less
7  than 30 days or termination.
8        Chief Newsome said he was thinking 14 days, and
9  we kind of went back and forth about it for a while.
10   Q.   Did he end up receiving at least 14 days that
11 you're aware of?
12   A.   I believe he received 30 days.  Like I said, I
13 never had the privilege of looking at the file.  That's
14 just rumor.  I wasn't a part of the investigation
15 anymore.
16   Q.   And when you met with Chuck Smith, the city
17 attorney, and the chief of police, did you recommend
18 that the other officers' conduct also be --
19   A.   Yes.  I also recommended that they get
20 discipline too.  I'm sorry.
21   Q.   Were you aware of the fact that none of the
22 other officers were disciplined?
23   A.   Not that I'm aware.  None of them received any
24 discipline.
25   Q.   Were you aware of the fact that Officer Grayer

Page 34

1  was involved in some of the Tasering [sic]?
2     A. Rumor. Like I said, I never had the privilege
3  of looking at the case file. From what I understand,
4  after -- this was just rumor. I was told -- I can't
5  even specify who said it to me.
6        After Diez did what he did to Mr. Van Alston,
7  it was said that Grayer Tased him afterwards. Then I
8  really hit the fan on that. I got a little emotional
9  about it.
10    Q. When you say "rumor," are you saying within the
11 department?
12    A. Within the department.
13    Q. Other officers are telling you this?
14    A. Yes.
15    Q. And other officers -- did you have a bond with
16 certain officers in the department where they would feel
17 comfortable coming forward and telling you of problems
18 in the department?
19    A. Yes. Yes, I did.
20    Q. I mean, for lack of a better word, were you one
21 of the people that people trusted that if they told you
22 something --
23    A. I wouldn't tell.
24    Q. -- you would go back to the person --
25    A. Right. I wouldn't put their name out there

Page 35

1  because, you know, they were afraid of repercussions.
2     Q. Okay. And when you say they were afraid of
3  repercussions, the other officers on the force might
4  take it out on them if they start reporting their
5  conduct?
6     A. That or possibly from what they felt the other
7  officers or the chief, so...
8     Q. And so when you heard about the Taser incident,
9  did you make any further recommendations?
10    A. It was all verbal. Like I said, I never had
11 the privilege of looking at the case file. I didn't put
12 anything in writing. It was just verbal from what I was
13 being told.
14    Q. And verbally, who did you talk to about --
15    A. Chief Newsome.
16    Q. Okay. And did you ask that he take some action
17 regarding the Tasering of Mr. Van Alston after --
18    A. Tasering of him, the officers standing around,
19 yes.
20    Q. At that point, did you have an opinion about
21 the use of Tasers, the training on the use of Tasers
22 that were going on in North Chicago?
23    A. I had an opinion about the Tasers before we got
24 them. I told him because of the large amount of
25 complaints that we were receiving from the officers, we

Page 36

1  never should even get the Tasers. It's like giving them
2  more power to do things, but it went ignored.
3     Q. And when you say you told -- is that with the
4  chief?
5     A. I believe it was me, Chief Newsome, it might
6  have been Sergeant McCray, Sergeant Wilson, Lieutenant
7  McClary could have been in there, Sergeant Cecala. We
8  were just sitting around talking about it when I found
9  out they were talking about getting Tasers and I was
10 like, that's not a good idea. It was nothing like a
11 meeting or anything. It was just a talk.
12    Q. Was there a formal training when the Tasers
13 came in the department that every officer who's going to
14 carry a Taser had to go through certain training?
15    A. We all had to go through a training. First
16 they came in and I believe they trained all the chief
17 commanders to be instructors but they also trained the
18 remaining officers. And we do have to go through that
19 training.
20    Q. And is there an update on that training? In
21 other words, if you're going to continue to use it every
22 year, you've got to be recertified?
23    A. That I'm not really sure. You would have to
24 talk to Sergeant Wilson about that. He was the one that
25 did all our training. Like I said, some things went

Page 37

1  right past me. It would be from him to Chief Newsome.
2     Q. Were you aware of the fact of how the Tasers
3  worked that if somebody actually discharged the Taser
4  there would be some kind of video?
5     A. Yes. I was Tased.
6     Q. You were actually Tased?
7     A. Yeah. Not in training. I was just Tased one
8  day prior to even having the training. I let them just
9  Tase me. It's not a good feeling.
10    Q. Okay. And did you do that in order to know
11 what it would feel like to be Tased?
12    A. Yes. When I actually did go through the
13 class -- I believe, it was a four-hour or eight-hour
14 class. I can't recall. It was on a Saturday. They
15 wanted to Taser me again. I was like, oh, no.
16       But, yeah, they -- the instructor did say that
17 they would prefer that the officers get Tased so that
18 they would know how it feels when they're Tasering
19 someone so they would know it's not something to play
20 with.
21    Q. When you were -- is that a painful procedure?
22    A. Yes, it is.
23    Q. I mean, you've stuck your finger in an outlet?
24    A. 50 million times worse than sticking your
25 finger in an outlet. It's painful.

Page 38

1   Q. Once you were Tased, do you think you would
2  have had any ability in the seconds following being
3  Tased to resist or not put your arms behind your back?
4   A. No. They specified that some people can
5  actually perform while being Tased, but some, you're
6  totally immobile. I was immobile.
7   Q. Okay. Did you observe other people being
8  Tased, officers?
9   A. Uh-huh.
10  Q. Were any of those officers able to move after
11 being Tased?
12  A. Not in my class, no.
13  Q. Okay. Somebody -- some wild chance they
14 describe that there was an occasional person that can
15 somehow overcome and accept the electrical shock?
16  A. Yeah, they did. They did explain that to us.
17  Q. Okay. But they said that's a pretty rare
18 occurrence?
19  A. It was pretty rare to not even scream. I think
20 we had two officers that didn't really scream or buckle
21 too much throughout the whole department. But the rest
22 of us, you went down and you were hollering. It hurts.
23  Q. And right away -- you don't get control of your
24 limbs right away, you --
25  A. It takes a second to refocus. I, myself, I got

Page 39

1  a headache instantly. It affects people differently.
2   Q. Part of what you learned is how the Taser
3  works.
4      Isn't there a camera on the Taser?
5   A. There's supposed to be, yes.
6   Q. Now, can an officer prevent the camera from
7  actually functioning?
8   A. I believe they can. I believe there's a way
9  that they can hold their hand where they can prevent it
10 from being seen. There's some -- I can't say
11 specifically because I wasn't out on the road, I didn't
12 use the Taser on a regular basis. I just went through
13 the training that one time.
14  Q. If you put your finger over the camera, you can
15 prevent --
16  A. You can prevent anything -- yeah, you can
17 prevent it from being seen.
18  Q. In terms of the Tasers that were issued to the
19 department, did they have a chip in it to where it would
20 record what would go on when you used it?
21  A. Yes.
22  Q. And were the -- when the Tasers were
23 introduced, was there a policy that required -- like
24 somebody pulling out a gun or using their gun -- that
25 you had to document when you used your Taser and you had

Page 40

1  to then download what came on those microchips to show
2  the length of time or what you did with the Taser?
3   A. I believe it was, yes.
4   Q. Did you ever see any documentation where
5  somebody documented specifically, I downloaded the
6  Taser, I used the Taser?
7   A. No. I've never seen anything like that, no.
8   Q. Do you know, in the department, was that policy
9  being followed at all?
10  A. Let me back that up. If there was a sense -- a
11 case where an officer used a Taser, normally when they
12 wrote their official report, it would be included in the
13 report. I don't know if there was a separate document
14 for it, though. That would be the report where they did
15 have to use their Tasers.
16  Q. And would that require a separate use-of-force
17 form?
18  A. You should -- you should put it on a
19 use-of-force form, yes.
20  Q. Now, when you use the Taser, it lasts for like
21 four seconds?
22  A. Five seconds, I believe, yes.
23  Q. Okay. And once you let go of the trigger, does
24 it then recycle itself to where you could actually use
25 it again?

Page 41

1   A. The prongs are no longer any good so if a
2  person still remains resistant, then you're supposed to
3  walk up to them and they call it a dry sting where you
4  actually put the -- the actual Taser on that person and
5  that's supposed to like give them another little shock.
6   Q. As part of your training as officers, were you
7  aware of the fact that if you let the battery run down
8  to zero or totally inoperable, that the recording on the
9  microchip, you then can't get any information off it?
10  A. I heard that that was possible, but once again
11 I wasn't using the Taser like that. I never even
12 carried a Taser. I went through the training and I was
13 pretty much done with it unless we had a situation where
14 we had to have knowledge.
15  Q. If somebody went to the hospital as a result of
16 a use of force that -- whether it was justified or not
17 justified -- and you had to use your Taser and you had
18 to Taser them, was there any rule in the department that
19 you had to then come in -- they went to the hospital
20 because you used a Taser, therefore, you have to
21 download the information that came from that Taser?
22  A. It could have been, but I'm not sure. Like I
23 said, a lot of things went on in that department that I
24 wasn't privy to. I was the assistant chief, I know it
25 sounds pretty strange, but certain things Chief Newsome

Page 42

1  went directly to the person he would have dealing with
2  that specifically and it would just be between them two
3  I guess.
4     Q.  But there was no written policy in place by
5  North Chicago that required officers when that happened
6  that you'd have to document the Taser information, that
7  didn't --
8     A.  Not that I'm aware of.  There was a policy for
9  the Taser in place, but I don't know if it had those
10 specifics in that policy.
11    Q.  And if that policy was instituted, everyone
12 that got the Taser training, every officer would be
13 aware of the policy if it would have been implemented?
14    A.  They should have been, yeah.  It should have
15 been given to them in that policy, yes.
16    Q.  You talked about certain case files of use of
17 force, things that happened.
18        Were there certain case files that -- and you
19 talked about that you were not allowed to look at or the
20 chief took over?
21    A.  Yeah.  I can't say if I was allowed.  I don't
22 know what it would be, what the case was in the
23 background.  But there was certain things that were
24 going on that I wouldn't have privy to that information,
25 no.

Page 43

1     Q.  And did you feel like some of the case files
2  were being hidden from you?
3     A.  I felt -- yeah.  There was just certain things
4  he didn't want me to know, I guess.
5     Q.  You were one of the outspoken critics of the
6  chief or some of the use of force of what was going on
7  in the department?  Were you the voice behind the scenes
8  going, look, guys, we got some problems here we need to
9  take care of.  There's some things going on that aren't
10 right?
11    A.  Yeah.
12    Q.  And was this an ongoing thing --
13    A.  Yeah.
14    Q.  -- where you'd be doing it pretty regularly
15 when it came up saying --
16    A.  This is getting out of control.  It's going to
17 get worse.  It's getting out of control.
18    Q.  And what was the response from the people you
19 were discussing this with?
20    A.  I said it to -- the response would be, well,
21 things are going to change.  Well, we're going to get it
22 under control.  It's going to change.  The same thing
23 every time.
24    Q.  And mostly that's coming from the chief?
25    A.  Chief.  I've had the meeting with the mayor

Page 44

1  about it, HR director, these guys are getting worse and
2  worse.  Until we start disciplining, it's going to get
3  out of control.  We're going to change.  The chief
4  should be making you aware of this.  There's no
5  communication between the chief and me.  He never tells
6  me anything.  Things are going to change.  That's all I
7  would hear.
8     Q.  But nothing changed?
9     A.  Not that I saw, no.
10    Q.  You mentioned HR, who is the director of HR?
11    A.  I think her name is Angela McCray.  She's the
12 HR director/the chief of staff which is the mayor's
13 assistant.
14    Q.  And you understood the chief of staff as the
15 right-hand person for the mayor?
16    A.  Yes.
17    Q.  And she was also the person that's taking any
18 complaints?
19    A.  Yes.  From the police.
20    Q.  The position, did you feel like that was --
21    A.  It was conflicting to me.
22    Q.  Did you feel like it was a conflict of
23 interest?
24    A.  Yes, it was a conflict of interest.  But I
25 speak my mind, so I wasn't worried about it.

Page 45

1     Q.  And the reason is because if anybody had a
2  complaint about what's going on in the department or
3  going on in the mayor's office, it's going right back to
4  the chief?
5     A.  Right back to him, yes.
6     Q.  Or the mayor.
7     A.  The mayor, the chief, whoever.  They were all
8  pretty cool with each other, good friends.
9     Q.  So in terms of having that sense of you can
10 report something to your HR director and feel that they
11 would keep something confidential that you're
12 reporting --
13    A.  Oh, no.
14    Q.  -- that wasn't happening?
15    A.  Not that I -- no.
16    Q.  Okay.  I mean, she had a duty --
17    A.  I don't think it was.  But me as a person --
18 being the type of person that I was, I spoke my mind to
19 her.  Some of the other officers, though, they would
20 have concerns about speaking with her regarding certain
21 issues because they felt because of their relationship
22 that, you know, it would get back and they would be
23 hesitant about speaking to her.
24    Q.  And the mayor appointed the police chief?
25    A.  Yes.