Page 46

1  Q. And you knew they were friends or friendly?
2  A. Yes, they were, from what I understood.
3  Q. And if an officer reported something to HR and
4  it got back to the mayor, it's going to get back to the
5  chief and it could have consequences?
6  A. And a lot of officers were afraid, yeah,
7  because of that, yeah.
8  Q. And that is why I think you had mentioned that
9  some would come directly to you because they feel that
10 sense of confidence that you would --
11 A. Yeah. I would just tell them, hey, chief, I
12 was just briefly told by, you know, somebody that this,
13 that, and the other had happened. Are you aware of
14 this? This needs to be looked into. I know about it or
15 I'll take care of it. Don't worry about it. That would
16 be the response.
17    I would never -- he tried several times to get
18 me to disclose who I was getting information from, I
19 would never tell though.
20 Q. Did you feel that as a result of that level of
21 trust that you developed or the complaints that you were
22 making that the mayor kind of shut you out from being
23 involved in a lot of the decision-making -- or the
24 chief?
25 A. I was getting ready to say I can't say if the

Page 47

1  mayor did. I felt he was a part of it, but I know the
2  chief did, yeah, closed me out from it, yes.
3  Q. And when you say "closed me out from it," what
4  do you mean by that?
5  A. There was a lot of things that had been going
6  on around the department. There were a lot of
7  infractions that were being made by some of the officers
8  that the chief supposedly was good friends with that I
9  was not made aware of. I would find out maybe a month
10 later. Some things that had occurred that was pretty
11 serious, I would find out maybe a year later.
12    And he would deny -- the chief would deny
13 knowing some of these things had been happening or had
14 been occurring, but the officers would be pretty
15 strong-willed on saying he was aware of it and they had
16 spoke to him about it.
17 Q. There's a case involving Shamecia De'Vost. She
18 was on 14th Street and was at the Best Market.
19    Were you made aware of that case?
20 A. Yes, I recall that.
21 Q. And I believe it involved Officer Keske?
22 A. Yes.
23 Q. In terms of the department, had you been made
24 aware -- and I understand it comes through word of mouth
25 because you're not on the street.

Page 48

1  A. Right.
2  Q. Something about him using gloves or only using
3  gloves when he was encounter African-American people?
4  A. I hadn't been made aware of that situation, no.
5  Q. Okay. Is that something that you may have
6  learned about later --
7  A. Yes.
8  Q. -- or after you left or whatever was going on?
9  A. Yes, I heard about that.
10 Q. Have you reviewed the video that involves
11 Shamecia De'Vost?
12 A. No, I never saw the video. I did know about
13 the situation. I spoke to the chief about it. He told
14 me he had set up a meeting with Shamecia's mother which
15 was one of our council members.
16    I was looking forward to this meeting but
17 towards the -- I think the day of or a couple days
18 before the meeting, the chief told me I wasn't needed,
19 he would take care of it. I never heard anything else
20 about that particular case.
21 Q. Did you feel like that case was just swept
22 under the rug?
23 A. Those were my thoughts, yes.
24 Q. Okay.
25 A. That it would be swept under the rug. I don't

Page 49

1  know if it did. I felt that that was going to happen,
2  yes.
3  Q. Was there a certain relationship that you had
4  noticed between Officer Keske and the chief?
5  A. Not that I knew, no. He -- he -- somewhat had
6  an open-door policy with some of the officers, they
7  could just come right in and sit down and have a meeting
8  with him. It was different with me, though. When they
9  came to my office, they were a little nervous.
10 Q. Okay. There's something that I think you had
11 brought up before, and I don't think we talked about it.
12    Did the chief have a certain way of
13 disciplining certain officers of a particular -- whether
14 it was a race or particular gender and then other
15 officers he would treat differently?
16 A. From -- there was a situation where we were --
17 we were having some issues with some officers not
18 showing up for traffic court. And I had noticed that he
19 had -- Sergeant Cecala, he would go to the traffic court
20 and he would come back with write-ups. Sergeant Cecala
21 is Italian.
22    I noticed from Sergeant Cecala that I was
23 getting a lot of write-ups on some of the black and
24 other minorities in the department. Very few did I get
25 on any white officers, if any.

Page 50

1    And I found out later that they were also not
2  showing up for court from one of my informants, that,
3  you know, they're -- you guys are suspending these black
4  officers and these white officers are not coming to
5  court either.
6    So I asked Newsome about it and he told me that
7  he wasn't aware of it and he would talk to Cecala. I
8  didn't think he was going to do anything, so I took it
9  to Sergeant Cecala myself. I confronted him about that.
10    I said you're putting yourself in a situation
11  where you're going to be accused of discrimination. Are
12  you doing this, submitting write-ups on these black
13  officers and from what I'm understanding, a lot of these
14  white officers -- and I called out the names Bogdala,
15  Will, Strurt -- I can't say Strurt. Sorry. Hartmann.
16  It was a couple of them which were all officers on
17  midnight.
18    And I said I'm understanding they're not
19  showing up for court either and I'm not receiving any
20  write-ups for them. And he said, well, I'm writing them
21  up. What do you mean? I'm not getting any. He said
22  I'm putting them in your guys' box. There's a box
23  outside our office that they could put in overnight
24  things that need to be put in there.
25    When I got ready to read, I said, you know

Page 51

1  what, that's not good enough because I haven't receive
2  these write-ups from you. I'm going to write you up
3  because like I said, you're showing a pattern of
4  discrimination. He was like, no, wait a minute. I have
5  been writing them up. The chief told me to give him
6  their write-ups.
7    So I confronted the chief about that and he
8  told me that Sergeant Cecala was lying on him. A couple
9  of weeks later he was in the office for a few minutes
10  and he called me over there for something and when I
11  looked down, the write-ups that Cecala had did on
12  Bogdala and Will were sitting on his desk. I didn't
13  even confront him about it.
14    Q. You knew the chief had lied to you?
15    A. Yeah, he had lied to me. What's the point?
16    Q. So you knew he had -- at that point you knew
17  he had the write-ups on the white officers and you knew
18  he didn't discipline them?
19    A. And I believe he told Sergeant Cecala to not
20  give them to me, to just give them straight to him.
21  That's my belief.
22    Q. I understand.
23    Were you involved specifically in training any
24  of the particular officers on the force?
25    A. I trained officers back in 1993.

Page 52

1    Q. You were a field training officer?
2    A. Yes.
3    Q. Is the field training program very important to
4  the department?
5    A. Yes.
6    Q. And why is the field training important?
7    A. It pretty much gives us an idea of what type of
8  officer the person that we're training is going to turn
9  out to be. It's also kind of iffy because a lot of them
10  come on and they put on an act. They know they're in
11  training for, what is it, 16 weeks, so they put on a
12  show for us and when they get out on their own, it's a
13  whole different person. But, yeah, it's pretty
14  detrimental.
15    Q. And in terms of that, they go through the
16  academy, but the real life street action is different
17  than the academy?
18    A. When I came from the academy, the first day I
19  rolled, my field training officer, he told me to forget
20  everything that I learned at the academy and this is the
21  way North Chicago do things.
22    Q. They have their own policies?
23    A. Yeah. We have to learn their policies, we have
24  to learn the city, the streets, you know, learn the
25  citizens, the rules and regulations, things like that.

Page 53

1    Q. And if you're a new officer, is there a certain
2  time frame where if you don't pass the field training
3  program you can be discharged, you can not be accepted,
4  you're like on a probationary period?
5    A. Yeah. It depends what it is. There's a mark
6  on there on the paperwork of the field training
7  officers' paperwork that says "do not respond" which
8  means you're constantly training this person in this
9  particular area but for some reason, they're not picking
10  up on it.
11    So depending on what that area is and the
12  seriousness of that particular area, they can be
13  terminated without cause.
14    Q. I see. So it depends on the infraction?
15    A. Yes.
16    Q. Were you aware of field training officers that
17  were going on when you were the assistant deputy to
18  where people are not being recommended and --
19    A. No.
20    Q. -- they were still coming on or did that get --
21    A. That would bypass me. That was from Sergeant
22  Wilson to Chief Newsome.
23    Q. Okay. Was that something that when you were
24  part of the operations that you expected to be a part
25  of?

Page 54

1    A.  You would think, yes.
2    Q.  So that was a job duty of operations when you
3  took over in 2007 that seemed to be taken away from you?
4    A.  Yes.
5    Q.  Did you -- were you made aware of any officers
6  that may have not been passed through the field training
7  that --
8    A.  Not --
9    Q.  -- that came back and -- that didn't pass and
10 were still --
11   A.  If I was made aware, it was probably a year
12 later or something like that.  It wasn't -- by that time
13 they're off of probation and everything.
14   Q.  Did you know Darrin Hanna, Dagwood?
15   A.  Not well, but I knew him.
16   Q.  And just from growing up in the neighborhood?
17   A.  Well, I didn't grow up there but I remember him
18 from when I was in school that one year, and he was a
19 friend of one of my nephews.
20   Q.  Okay.  You obviously weren't there at the time
21 his incident occurred, correct?
22   A.  No.
23   Q.  That happened shortly after you left?
24   A.  From what I understand, yes.
25   Q.  There was an incident in North Chicago in terms

Page 55

1  of cars being taken in drug raids or being repossessed
2  or being taken by the city.
3        Are you aware of that?
4    A.  Yeah.  There's a procedure that we have in
5  place.  When we do raids on vehicles, on drug houses or
6  whatever or if we find drugs in certain vehicles
7  depending on where the vehicles are financially, if
8  they're paid for, we can actually seize them in and use
9  them for ourselves.  There's a procedure in place that
10 takes place, you know, on how to confiscate that vehicle
11 and keep it for the department.
12   Q.  And if you keep it for the department, is this
13 something where you can simply pull somebody over
14 today --
15   A.  No.
16   Q.  -- take drugs out of their car and drive the
17 car away?
18   A.  No.  There's a procedure.  You have to -- I
19 believe you have a certain amount of days that you have
20 to report it to the state attorneys' office as well as
21 the State of Illinois.
22   Q.  And then you have to -- they have to have a
23 certain time period in order to reclaim or challenge the
24 possession of the vehicle?
25   A.  Yes.  There's -- I believe they have to go

Page 56

1  through the trial and everything to see.  And then we
2  should get something back from the state saying you have
3  to give the vehicle back or you can keep it.  It depends
4  on what you want to do; it depends on the condition of
5  the vehicle.
6        We would auction them off sometimes, sometimes
7  the city would keep them.  I'm not too familiar with it.
8  I didn't have anything to do with that.
9    Q.  Were you aware that there were cars being taken
10 in North Chicago and the procedures weren't being
11 followed?
12   A.  Yes.  I was made aware of it after one of our
13 lieutenants made an accusation towards Chief Newsome for
14 doing that.
15   Q.  Which lieutenant made that accusation?
16   A.  Lieutenant Curtis Brame, B-r-a-m-e.
17   Q.  And when Lieutenant Brame made that accusation,
18 what did you observe or what did you see happen?
19   A.  I was told.  Because like I said, I wasn't
20 really around any of that.  After he made the accusation
21 to the mayor about his beliefs that Chief Newsome was
22 taking these vehicles, he told me that he watched
23 Sergeant Cecala and Chief Newsome bringing back the
24 vehicles.  They were given two weeks to bring everything
25 back.

Page 57

1        It was said that Mayor Rockingham had got one
2  of our lieutenants to investigate the case which was not
3  appropriate.  I can't investigate Chief Newsome, he's
4  our boss.  It should have been taken to an outside
5  agency.  Why that wasn't done, I don't know.  I wasn't a
6  part of it.  They kept me kind of in the dark about it.
7  Anything pertaining to that situation, like I said, it
8  was basically told to me by someone else.
9    Q.  And that was other officers within the
10 department that were informing you of the problem?
11   A.  Of what was going on.
12   Q.  Okay.  And basically, did you hear that
13 officers had cars at their homes?
14   A.  Yeah.  It was accusations that supposedly Chief
15 Newsome had took one truck and painted it and was using
16 it for his own benefit.  I believe they said that one of
17 the officers, Rivera, supposedly had one out at his home
18 in Palatine and the rest of them I can't say.  Like I
19 said, those were basically rumors.  I wasn't privy to
20 that.
21   Q.  You talk about having a home in Palatine, were
22 there certain residency requirements for the officers
23 within the department?
24   A.  Yes.
25   Q.  And what was the locale?

Page 58

1  A.  I believe -- I can't say the last actual
2  locale, last year was pretty rough for me so my memory
3  is...
4  Q.  I think it was 14 air miles?
5  A.  Fourteen or 15 air miles.
6  Q.  Would Palatine count as 14 --
7  A.  I would have to look at the miles.  I doubt it,
8  but I would have to look at the map.  I doubt it.
9  Q.  How about Indiana?
10  A.  I doubt it.  No.  I know that.  No.
11  Q.  Were you aware of the fact that there were
12  certain officers that were living outside the district?
13  A.  We were doing some negotiations for contracts
14  at one point and one of our HR directors, Devin Mozel
15  (phonetic), she did specify numerous times that there
16  were officers living outside the city limit, outside of
17  the air miles.  But nothing ever happened.
18  Q.  Were you aware of the fact that they would --
19  that they were enforcing that against some officers and
20  not others?
21  A.  No.  I figured if they -- I didn't know that
22  they were enforcing it at all.  That's the problem that
23  Ms. Mozel had, they weren't being enforced.
24  Q.  And who would be the person that would be in
25  charge of enforcing?

Page 59

1  A.  Chief Newsome.  He's the one that has the
2  authority to tell Sergeant Wilson to check into it.  I
3  did find out later that one of our officers, Valiza
4  Nash, was forced to move back within the limits after
5  buying her, I believe, a home in Prairie.
6  Q.  Kenosha?
7  A.  Was it Kenosha?  One of the cities in
8  Wisconsin.  And she was forced.  But I found that out
9  way later because I would have told her, no, don't move.
10  If the rest of them is allowed to stay, then you should
11  be allowed to stay outside of it.
12  Q.  Okay.
13  A.  And I heard she lost pretty badly financially
14  and behind that too.  But I'm not sure.  Like I said, it
15  was a rumor.
16  Q.  Were you made aware of the Walter White
17  incident that involved Officer Parrin (phonetic) just in
18  general?
19  A.  I would have to -- when you call out some of
20  the victim's names, you would have to familiarize me
21  with the actual incident.
22  Q.  How about the Paul Smith incident, the booking
23  room that Officer King was involved in?
24  A.  Wasn't sure of the victim's name, but I do
25  recall that incident.  I did write a recommendation that

Page 60

1  it be looked into by internal affairs.  If that's the
2  particular incident, I do recall seeing a video of King
3  mishandling someone in our booking room and I
4  recommended that it be looked into by internal affairs
5  and some type of disciplinary action be taken.  I don't
6  know what the outcome of it was, though.
7  Q.  Did you actually do a write-up and either send
8  it by e-mail or slide it under Chief Newsome's door
9  regarding that incident?
10  A.  It was either -- it could have been one way or
11  the other.  I can't recall exactly how I sent it.  I may
12  have sent it under his door.  If I did send it through
13  an e-mail -- Chief Newsome was known for lying on me a
14  lot around the department.  He would tell people that I
15  was aware of certain things when it wasn't true.
16  What I started doing is I would -- I started
17  e-mailing him a lot but I would blind-copy Sergeant
18  Wilson and Lieutenant McClary.  They were two of the
19  people that were trying to figure out who was telling
20  the truth about what.  And, you know, it's a couple of
21  times he lied on me to them.  They found out that he was
22  actually lying because of the blind copy.
23  Q.  So within one to two weeks, am I correct that
24  involving the Paul Smith incident in this booking room,
25  you actually wrote up and requested that certain action

Page 61

1  be taken against --
2  A.  I verbally told him and I put it in writing,
3  yes, but I can't remember which way.
4  Q.  It was one of the two?
5  A.  Yes.
6  Q.  And as a result of that --
7  MS. COLLISON:  No.  She said she verbally told
8  him and put it in writing, either in an e-mail or -- it
9  was both.
10  BY MR. O'CONNOR:
11  Q.  And what I'm saying is one of the two is you
12  either put it in e-mail or you slid it under his door,
13  that's what I was saying, and verbally you told him,
14  correct?
15  A.  Yeah.
16  Q.  And you did that within one to two weeks after
17  it happened?
18  A.  More than likely, yes.
19  Q.  And as far as you're aware of, no disciplinary
20  action was taken?
21  A.  Not that I'm aware of.
22  Q.  Did you ever get a chance to review Sergeant
23  Cecala coming in after the incident and cleaning up the
24  booking room?
25  A.  I don't recall seeing that initially, no.  I

Page 62

1  don't know if I just got upset after seeing the video
2  and maybe walked away, but I don't recall seeing the
3  white shirt coming in, no.
4      Q.  When you reviewed that video, was it -- from
5  just your view of the video, did you conclude that there
6  was an excessive use of force being done on Mr. Smith?
7      A.  Yes.
8      Q.  Okay.  And did that appear to be pretty clear
9  to you from the video itself?
10     A.  Yes.
11     Q.  Did you forward that video at all or make a
12 recommendation that it get forwarded to the state's
13 attorney for whatever they would do or no?
14     A.  No.
15     Q.  Your recommendation was to handle it
16 internally?
17     A.  I just recommended to the chief, yes.  That's
18 as far as I got.
19     Q.  In terms of the extent of the damage to
20 Mr. Smith, you weren't aware of what the extent was?
21     A.  No.
22     Q.  You could just see from the video that there
23 was blood -- or blood that came from his nose area?
24     A.  I could see that he was being mishandled.  I
25 didn't even know his name, like I said, at the time.

Page 63

1      Q.  Okay.  And would Sergeant Wilson or Sergeant
2  Montgomery have been the ones to investigate the --
3      A.  Lieutenant McClary.  Sergeant Wilson was our
4  internal affairs sergeant.  Lieutenant McClary would
5  normally help him on checking into certain things.
6  Yeah, it would be those two.
7      Q.  And do you know if they did an investigation or
8  not?
9      A.  I don't know.  I don't know what the chief said
10 to him.  All I could do was recommend.  I couldn't tell
11 them to outright do an investigation.  It would have to
12 come straight from the chief on whether internal
13 investigations were being done.
14     Q.  There was -- do you recall being made aware
15 of -- strike that.
16         Was there certain officers that had dogs with
17 them, police dogs that were being trained?
18     A.  We had three dog handlers:  Officer Burns,
19 Officer Bogdala, and Officer Geryol.
20     Q.  In terms of any of those officers, did you ever
21 make a recommendation that they not be a dog handler?
22     A.  I didn't feel that Officer Bogdala should have
23 been a dog handler because of some prior discipline that
24 he had been receiving because of his aggressive nature.
25     Q.  And when you talk about that prior discipline,

Page 64

1  are you talking -- this was before 2007?
2      A.  Yes, I believe so.
3      Q.  And what was the nature of the discipline that
4  you were talking about that he had in his past?
5      A.  It was rumored that he was too aggressive with
6  some of the citizens.  There was complaints of excessive
7  force with different citizens regarding Officer Bogdala.
8      Q.  And you felt that him having a dog, which is
9  another form of --
10     A.  Force.
11     Q.  -- force, that perhaps he might misuse that as
12 well?
13     A.  Yes, that's my thought.
14     Q.  And did you make a recommendation about Officer
15 Bogdala and using dog handling or being part of dog
16 handling?  Who did you make that --
17     A.  I spoke it to Chief Newsome.  Let me think.
18 Yeah, I spoke it to Chief Newsome.  They -- the way it
19 went, there was a process where supposedly there was
20 some interviews on who would be dog handlers.  They had
21 a guy come in from TOPS training.  Chief Newsome
22 conveniently wasn't able to make that particular meeting
23 so it was me, Deputy Chief Holderbaum, and a couple of
24 guys from TOPS that came in.
25         Bogdala's interview with the TOPS guy was not

Page 65

1  impressive to me.  He didn't know much about dogs but
2  for some reason this guy kept specifying Bogdala's name
3  and I saw then that, you know, something was going on.
4          And I said we're already having problems with
5  him, with his aggressive behavior.  I'm not going to
6  sign off on his recommendation for him.  And the guy
7  kind of backed down a little bit, but I don't know what
8  happened after that.  He ended up getting a dog.  He
9  didn't get it immediately.
10         I think Geryol ended up beating him out after I
11 spoke about it because the TOPS guy wasn't really
12 comfortable with it.  And we didn't have another
13 interview process and then the next thing you know,
14 Bogdala ended up with a dog anyway.
15     Q.  Would you have anticipated, then, at the next
16 meeting or if there was a next meeting, the chief would
17 have taken over when he came back and you wouldn't have
18 been a part of it?
19     A.  Probably.  That's probably what happened.  He
20 ended up with a dog anyway.
21     Q.  Someone has to sign off on it?
22     A.  It wasn't me.
23     Q.  Were you made aware of the fact that he wasn't
24 involved in a certain incident where the dog attacked a
25 man's leg and actually broke his leg?

Page 66

1    A.  Yeah, I believe I was.  I don't know about the
2  breaking of the leg.  I know that they -- we would get a
3  complaint, one of the guys' dog bit someone.  It'll be
4  in a report.  Can't say specifically which incident is
5  which.
6    Q.  Okay.  We have a -- there's an incident of
7  Walter Rather where actually some people have discussed
8  that Officer Bogdala actually put a picture on Facebook
9  of the victim's --
10   A.  I'm familiar with that.  It had came to me that
11 Bogdala had a picture of a dog on his Facebook page, of
12 a dog bite with some statement that was being made by
13 Bogdala regarding messing with the police.
14   Q.  This is what happens to you if you run from the
15 police or something to that nature?
16   A.  It could have been that.  When I found out,
17 immediately I got in contact with the chief and told him
18 about it.  Hey, you need to have Sergeant Wilson look
19 into this because that's improper.  He has no business
20 putting any type of dog bites; that's not what that's
21 for, not on a Facebook page.  And he said he would check
22 into it.
23   Q.  In terms of these dogs being trained, was it
24 your understanding that there's certain commands given
25 to a dog to pursue a suspect, certain commands that you

Page 67

1  can give to a dog to stop them from pursuing the
2  suspect, halt, or whatever the command would be?
3    A.  Yeah.  I'm not real familiar with the way that
4  works, but, yeah, that's pretty much the way it's
5  supposed to go.
6    Q.  You didn't sic a dog loose on somebody and let
7  them attack them, right?
8    A.  No.  There's levels of use of force you have to
9  use before you go to that level.
10   Q.  Let's assume you get to the level where
11 somebody's running and you sic a dog on them, you just
12 don't let the dog do whatever it wants to the person?
13   A.  No.  Basically that dog is just to stop that
14 person, from what I understand.  With their training,
15 it's just supposed to stop them and detain them until
16 the officer can get there and put them into custody.
17   Q.  And the whole purpose of going through TOPS and
18 all this instruction that the department pays for is so
19 you can teach the dog commands so it can stop attacking
20 a particular victim so you can stop the use of force at
21 any time you determine you want to?
22   A.  That sounds pretty much right.  They use them
23 for everything.  I can't specify.
24   Q.  And you had learned about the incident that
25 happened with this dog bite incident with Officer

Page 68

1  Bogdala after the fact that you had recommended that he
2  shouldn't be --
3    A.  Right.  I heard about the Facebook, that's when
4  I found out about the incident and I told Chief Newsome
5  about it.  He needed to have Wilson check into it
6  because that was improper.
7    Q.  Did you ever make a recommendation that they
8  not use dogs or only certain officers use dogs?
9    A.  No.  The only recommendation I made was that
10 Bogdala shouldn't get a dog after several incidents
11 of -- complaints of his excessive force.
12   Q.  And you were aware of the fact that before that
13 incident with the dog that Officer Bogdala had been
14 suspended for apparently striking a kid or something of
15 that effect?
16   A.  Yes.  There was a situation, yeah, where he
17 supposedly struck a kid that -- I believe it was a kid.
18 I don't know if it was a kid, teenager, grown person.
19       There was an incident where one of the officers
20 had -- they had been chasing a guy and one of the
21 officers caught him and after he placed the guy in
22 custody or was getting ready to put cuffs on him, by the
23 time Bogdala got there, he struck the kid.
24       It was witnessed by a citizen.  I wasn't over
25 administration at that time, so I don't really know the

Page 69

1  particulars about that case.
2    Q.  And then there was a video of an eye socket
3  incident where he -- with a young lady?
4    A.  There was a young lady he had placed into
5  custody.  I felt that he should have been disciplined
6  for that.  His -- they were in the booking room and he
7  said that she tried to go for his gun and they wrestled
8  and she supposedly -- he supposedly struck her some type
9  of way where he broke her obital [sic] socket.
10   Q.  Orbital?
11   A.  Yeah.  And then the video came up missing.  It
12 disappeared after that.  I'm not sure what happened with
13 it.  I was over administration at the time, so I'm not
14 real familiar with that case.  I do know -- I can't
15 recall the young lady's name.
16       I do remember hearing the guys say that she
17 ended up going to prison because she had a warrant for
18 something.  I thought a lawsuit was going to come in but
19 then when I realized that she had went to prison, I said
20 maybe that's why one didn't come in.
21       I told Newsome you need to put a grip on that.
22 It's getting out of control.  This is crazy.  And that
23 was probably one of the reasons I didn't want Bogdala to
24 have a dog.  I don't think he had a dog at that time.
25   Q.  And did you see the video of the incident

Page 70

1  yourself?
2      A.  Yes.
3      Q.  And then all of a sudden, it turned up missing?
4      A.  From what they say. I wasn't a part of it, I
5  never asked to see it again, but it was rumored that the
6  video came up missing. I don't know for sure.
7      Q.  And who is in charge of holding on to evidence
8  like videos? Is that Officer Cecala?
9      A.  Sergeant Cecala does our evidence, but I don't
10 know -- when you deal with situations like that, I can't
11 say. Some of our procedures changed when Chief Newsome
12 came into office. I don't know if the video went to his
13 office or what.
14         Certain things we will put up, certain things
15 pertaining to officers is kept separate from civilian
16 issues like reports on officers and things like that we
17 can't put in general population because we have a lot of
18 civilians that work there.
19     Q.  When you say that certain procedures changed
20 when Chief Newsome came in office, are you saying they
21 changed for the better or changed for the worse?
22     A.  They changed for the worse.
23     Q.  And why did they change for the worse?
24     A.  I have no idea. It's just -- that's a long
25 story.

Page 71

1      Q.  Okay. I mean, you have described for us that
2  when Chief Newsome took over, he took away certain
3  duties from you as the deputy chief seemed to take them
4  upon himself and determine discipline on his own and
5  take responsibility for that without other people
6  knowing exactly what's going on, true?
7      A.  I would say so, yes.
8      Q.  And was that one of the things where you didn't
9  have multiple people or levels of review going on to
10 where he could do basically the discipline he wanted to
11 for the officers he wanted to at that point?
12     A.  I would say. I really could only recommend. I
13 had no power to do any type of discipline except
14 recommendations as well as the shift commander. He was
15 the one that had the power to actually discipline
16 anybody. You understand me?
17     Q.  I do. For example, if it was brought to his
18 attention that there was a problem with an officer for
19 any given reason and he investigated it and determined
20 that it was serious enough to warrant discipline, could
21 the chief without any other action, in a matter of
22 immediate or whatever, from 2007 to 2011 when you left,
23 could he take action against the individual officers
24 immediately?
25     A.  Up until I believe it was 2011 he only had the

Page 72

1  power to suspend someone for five days. During the
2  course of negotiations of contracts with the police,
3  they gave him the power to actually do firing and
4  discipline over five days.
5          So before then, no, it would have to go through
6  the fire and police commissioner. After he was given
7  the power, he had the decision and the power to fire,
8  suspend five, ten, 15, 20 days.
9      Q.  Or fire completely?
10     A.  Yes.
11     Q.  So by the time you left in July of 2011 --
12     A.  Yes.
13     Q.  -- he had the power to take an officer who he
14 felt was not acting appropriately and issue any level of
15 discipline up to the point of firing?
16     A.  Yes.
17     Q.  And he could do that to immediately prevent
18 further action or further problems from happening in the
19 department?
20     A.  I can't say specifically he could do it
21 immediately, but he had the power, yes.
22     Q.  And immediately, may be within a matter of
23 days --
24     A.  Yes, it could be.
25     Q.  As far as you know, he never used that power

Page 73

1  that you observed?
2      A.  Not that I'm aware of, no. But it was
3  brand-new too.
4      Q.  Officer Rivera is someone we haven't talked
5  about yet.
6          Was he the one that you were -- you're
7  mentioning he had used vehicles that you were aware of?
8      A.  That was the rumor. I can't -- I never seen
9  it. It was said that he was one of the ones that was in
10 our drug unit at the time when the accusation came up
11 about Chief Newsome taking vehicles inappropriately.
12 They were saying that Officer Rivera had one supposedly
13 at his home.
14     Q.  And when you say that's the rumor, this is
15 information from other officers on the force?
16     A.  Yes.
17     Q.  So this is within the department coming from
18 your own officers?
19     A.  Yes.
20     Q.  Okay. People who you trusted to be reliable
21 that were giving you information?
22     A.  Yes.
23     Q.  And did you bring that up to the chief?
24     A.  I couldn't. He was being investigated for it.
25     Q.  I see. So it was an issue where you couldn't

Page 74

1  address it to him because he was one of the people
2  involved?
3      A.  Yes.  I don't know if it was -- came out to be
4  true or not.  You would have to speak to Mayor
5  Rockingham and Chuck Smith about that.
6      Q.  Okay.  Was there any discussion among --
7  whether it's the officers or what you had learned in the
8  department, that when Chief Newsome enforced or changed
9  the way the department ran, that the officers believed
10 that they didn't serve anyone anymore, that they
11 basically have carte blanche with the citizens on how
12 they decide to act in a situation?
13     A.  There was the rumor that supposedly he had told
14 some officers that they had carte blanche with the
15 citizens of North Chicago which meant they could do
16 whatever they wanted to do.  Have I ever heard him say
17 that, no.
18     Q.  When you say there's rumors, this is what other
19 officers in the department were letting you know was
20 going on?
21     A.  They were saying, yes.
22     Q.  And was there some issues where you were made
23 aware of the fact that certain officers were bringing a
24 vote of no confidence or trying to remove the police
25 chief?

Page 75

1      A.  Yeah.  Chief Newsome had told me that they had
2  did -- I think I was here in Vegas visiting and on
3  vacation and he had said that they were doing a vote of
4  no confidence on me because they wasn't happy with my
5  performance.
6          Once I got back, I found out that, in fact, a
7  vote of no confidence was being done on him and the
8  mayor and that I was not a part of it.  These are just
9  the way -- that's just the way he would say things.
10     Q.  And when you say a vote of no confidence, is
11 this where the board or somebody in the police
12 department comes forward and says --
13     A.  The union actually comes forward.  I believe
14 they'll go to the city council members and let them know
15 that they have no confidence in the way that the chief
16 is handling the police department.  And then whatever
17 happens after that, I'm not real familiar with it.  I
18 never had to deal with it.
19     Q.  So when you were out of town, you were made
20 aware of at least -- it would have been in 2011 or
21 2000 --
22     A.  2010.
23     Q.  You were made aware at that time that officers
24 within the department were bringing in a vote of no
25 confidence to whoever --

Page 76

1      A.  Yeah.
2      Q.  -- regarding both the police chief and the
3  mayor?
4      A.  Yeah.  But he told me that they were doing it
5  towards me, Newsome did.  That's what he told me.
6      Q.  And you found out --
7      A.  I probably would have been a part of it.  And I
8  don't know if they were -- strictly because I was a part
9  of the administration, it was like, hey, all of them
10 need to go, which is understandable.  Because there was
11 a lot of confusion.
12         Like I said, Chief Newsome had told a lot of --
13 from what I was getting, he lied on me a lot throughout
14 the department.  There was a lot of things that I wasn't
15 aware of and he was trying to convince a lot of people
16 and certain officers had brought it to me.
17         Like I said, I started blind-copying them on
18 certain things so they could see for themselves that he
19 was lying on me.  I'm not going to -- if I knew about
20 it, I will own up to it.  I'm not going to just blame
21 somebody just to blame them.  If it was my mistake, it's
22 my mistake.
23     Q.  In terms of the rank and file, Chief Newsome
24 was the sole person to dole out the discipline, at least
25 as of 2011?

Page 77

1      A.  Yeah.  He had the power to actually suspend.
2      Q.  And was it your opinion that that should have
3  been by a nonbiased committee as opposed to a person
4  who's within the department?
5      A.  Yeah.  I told some of the officers I thought it
6  was crazy that they would give that power to the chief
7  because they don't know if the chief will be fair or not
8  on dealing out the discipline.  I did say that.
9          And I told -- I believe -- like I said, it came
10 up during negotiations.  I said if I was the chief, I
11 wouldn't accept that.  I would leave it with the fire
12 and police commissioner because that's a nonbiased
13 committee, you know.
14     Q.  And, in fact, you had seen at least as it came
15 to discipline related to white officers who weren't
16 showing up for court as opposed to other officers that
17 he was doling out different --
18     A.  That's one of the concerns that a lot of the
19 black officers had with him getting that power.  I don't
20 know if there was a difference in ratio with black to
21 white officers and why he was voted to get it.
22         A lot of the black officers didn't want to -- I
23 can't say a lot of them, he had a few of them that he
24 was pretty cool with that didn't mind him having that
25 power, but the majority of them didn't want him to have

Page 78

1  that power.
2  Q. Now, the police chief actually had a relative
3  that was on the force, right?
4  A. Yes. He has a cousin.
5  Q. Officer Garrett (phonetic)?
6  A. Yes.
7  Q. Nephew?
8  A. I think it's his cousin. I'm not sure how it
9  works. I just know he's related some kind of way.
10 Q. And were you aware of the fact that he was
11 involved in an incident where he actually beat up a
12 prisoner in front of the station?
13 A. Yeah. It was on a video.
14 Q. And did you see the video?
15 A. I do recall seeing it, yeah.
16 Q. And did you --
17 A. I recommended that internal affairs look into
18 it. I believe it was a couple days later when I saw
19 that video, and I recommended that it be looked into and
20 some form of discipline be done. I don't know what the
21 outcome was.
22 Q. You're not aware of him receiving any
23 particular discipline?
24 A. No. No.
25 Q. And the sole person who would determine the

Page 79

1  discipline to be doled out would be his relative, Chief
2  Newsome?
3  A. Yes.
4  Q. I just want to ask your opinion from your
5  position of being on the force.
6      Did you get the impression that Chief Newsome
7  took a deliberate indifference to the complaints by the
8  various citizens and the things that came forward about
9  the police brutality that was going on in North Chicago
10 and that his failure to take those actions were going to
11 lead to something worse?
12 A. Yes. We had several conversations regarding
13 that. I told him that he, you know, had to step up the
14 discipline or that the officers was going to get out of
15 control. Nothing happened. That's why I was like, you
16 know, it's time for me to get out of here. I'm going to
17 secure my pension. I'm not fixing to fall with you.
18 I'm not going to fall.
19 Q. And that was one of the reasons you left?
20 A. Yeah, one of the main reasons.
21 Q. I mean, you left for your pension even before
22 you had reached the age where you could collect your
23 pension?
24 A. I was 46 years old. I had four years to go
25 before I could get my pension. The only good thing

Page 80

1  about it is I had 21 years, I was over the 20 years. I
2  just won't be able to collect for another -- well, now
3  it'll be three years.
4  Q. Did you feel if you had stayed with the
5  department that something really bad was going to
6  happen, whether it was somebody dying or something else
7  and that the blame was going to end up coming down on
8  you as being part of the administration?
9  A. They would have tried to blame me. If they
10 would have got away with it, it would have been a
11 different story, but I felt that they would have tried
12 to blame me. I had been told he had been blaming me for
13 a lot of his irresponsible decisions.
14 Q. Did you, though, think that this was Chief
15 Newsome working alone or was -- were other people, did
16 it appear to you, were working in concert with him?
17 A. Some situations that would occur that I would
18 confront Chief Newsome about he would bring the mayor
19 and Chuck Smith into it. They want me to do this and
20 they want me to do that. But if there was truth to what
21 he was saying, I don't know. He lied a lot. I can't
22 say whether it was him alone or if they were a part of
23 it or not.
24 Q. But you were aware of the fact that the mayor
25 himself was getting direct complaints from citizens

Page 81

1  where people would be coming in and complaining about
2  officers' conduct and the use of force?
3  A. Yes.
4  Q. And, in fact, the city attorney, you're aware
5  of the fact that he was involved in all of the
6  use-of-force issues?
7  A. I can speculate that he was. He should have
8  been. I do believe that a lot of internal
9  investigations when it was time to interview the
10 officers, that Chuck Smith would be a part of the
11 interview. So, yes, he should have been aware.
12 Q. And when it came time to doling out whatever
13 kind of punishment was going to be done, there would
14 be -- I know you weren't made a part of it, but there
15 would be discussions among the chief that you learned
16 later -- among the chief, the mayor, and perhaps the
17 city attorney if he was there?
18 A. It's possible, yeah.
19 Q. Okay. Did you -- were you of the opinion when
20 you were there that at least some different or more
21 training was needed to be done with these officers or
22 something to where they could learn more about how to
23 handle situations, how to deal with their aggression,
24 how to deal with situations?
25 A. They -- I had a different opinion about that.

Page 82

1  Chief Newsome, his excuse would always be I'm going to
2  train them, I'm going to train them. You've sent these
3  guys to various training, you've sent them to training
4  on use of force and it's not doing any good. You can't
5  change who a person is on the inside.
6      I felt that if he -- like a little kid, if you
7  have something on your table and you tell them to stop
8  it and you tap that little hand, they'll stop. If you
9  continue to let them get away with it, it's going to get
10 worse and worse and worse.
11     My thing was if you start disciplining these
12 guys and start giving them suspension, that's going to
13 mess with them financially and maybe that will make them
14 slow down because now you're hitting them in their
15 pockets. And that's going to possibly cause a little
16 rift at home of what are you doing. You need to stop
17 because we're falling behind in bills. That was the way
18 I looked at things.
19     Q. And in addition to that, you got some officers
20 which you've described you know what, I don't think they
21 should be on the force because of their personality or
22 the way they act, the way they treat people, correct?
23     A. Yeah.
24     Q. And then you've got the other officers who are
25 kind of the followers, who kind of learn from what they

Page 83

1  see the other sergeants, some older guys, some long-term
2  guys doing and then they kind of learn -- even though
3  they may be inside decent people, they're learning bad
4  ways or bad techniques to handle situationS?
5      A. I thought that, yes.
6      Q. And for those officers, the ones that they may
7  have learned or been trained by their superior officers,
8  the ones who have been there, did you feel that they
9  needed some kind of retraining, reprogramming,
10 reinstitution of rules or something that would have
11 taught them the proper methods and procedures of
12 handling like a hostile situation with the community or
13 where somebody's -- you know, their emotions are high
14 and how to react to that?
15     A. Yeah. May have done some of them some good,
16 yes.
17     Q. And if that would have been done with the use
18 of force, would you have expected it would have been
19 pretty clear that the use of force and the amount of
20 complaints that were coming forward would have reduced
21 if simply you made people accountable, sent them through
22 the appropriate training --
23     A. Yes.
24     Q. -- that that would have stopped it?
25     A. Possibly.

Page 84

1      Q. And did you feel like it would have likely
2  helped that situation if it would have been addressed in
3  a timely manner?
4      A. If it would have been addressed in a timely
5  manner, yes.
6      Q. Did you feel like it started -- by the time you
7  left, that the -- I'll call it abuse of citizens --
8  whether it's verbal, physical abuse -- that it started
9  to become widespread or custom in the department at
10 least on certain shifts like the night shift or certain
11 crews of people?
12     A. Yeah.
13     MR. O'CONNOR: Okay.
14     MS. COLLISON: I just have a few questions.
15 I'll be very, very fast.
16
17          EXAMINATION
18 BY MS. COLLISON:
19     Q. You mentioned earlier that when you first
20 became the deputy chief, one of the two, that you --
21 when the one deputy chief was removed, that you were put
22 in charge of patrol by Newsome, correct?
23     A. Yes.
24     Q. And why do you feel that you were put on patrol
25 by Newsome instead of the area in which you were

Page 85

1  excelling?
2      A. Initially -- I was under the impression
3  initially that there was going to be another deputy
4  chief to replace him. And he wanted to make me over
5  operations and put this particular person, which would
6  have been Lieutenant Theis, over operations.
7      And I told him no. You know a lot of our
8  complaints came from the shift that Lieutenant Theis was
9  on which was third shift and if he's the one that
10 created those problems, he should be the one to fix
11 them.
12     But I found out later on that they wasn't going
13 to replace operations -- they wasn't going to replace,
14 I'm sorry, Deputy Chief Holderbaum. So Chief Newsome
15 said, okay -- well, the way it was supposed to have
16 been, it should have been I was over everything and then
17 whatever happens with any area of the department, talk
18 to Chief Newsome.
19     He said, well, we have Sergeant Wilson and
20 Sergeant Cecala in our administration office, so we'll
21 have Sergeant Cecala take over administration and then
22 you just deal with patrol and I'll handle -- I'll
23 continue to handle investigations and the drug unit and
24 that way you don't play with those guys and they know
25 you don't play in patrol so maybe they'll tone down a

Page 86

1  little bit. Basically I guess that's his reasoning. I
2  don't know.
3      Q. And you had some concerns about Sergeant Cecala
4  taking over administration, correct?
5      A. What I had learned when I took it over is
6  that -- like I said before, certain -- if some of the
7  sergeants or lieutenants took vacation or was out sick
8  for a nice amount of time, we would have Sergeant
9  Cecala, Sergeant Wilson, or Lieutenant McClary cover the
10 shifts.
11         And I did note a few times -- because there was
12 an instance where I believe we were down two shift
13 commanders for a couple of months. Each time Cecala
14 would go out, there would be at least one or two
15 use-of-force complaints coming on whatever shift he was
16 working.
17     Q. And the use of force, there's a form that the
18 officers are supposed to fill out if they use force; is
19 that right?
20     A. Yes.
21     Q. And the force that they -- any force is
22 supposed to be recorded on the use-of-force form
23 including a Taser, a baton, putting your hands on
24 somebody?
25     A. Yeah. More aggressive manner than just placing

Page 87

1  handcuffs on them.
2      Q. It doesn't necessarily mean they have to go to
3  the hospital?
4      A. Right.
5      Q. And those forms are supposed to be signed off
6  on by a shift commander who determines if the force was
7  appropriate?
8      A. To determine if policy was followed, yes.
9      Q. And were those forms -- were you shown those
10 forms?
11     A. Some I would get, yes. They were supposed to
12 come to me.
13     Q. And if a form was not signed off on, would you
14 have seen that form?
15     A. Yeah. I would send it back to the shift
16 commander and question him about it.
17     Q. So you were aware that some of the forms were
18 not being signed off on?
19     A. Well, if they came to me, they would end up
20 eventually signed off, yeah. I would give it back to
21 that chief commander and made sure that I got it back
22 signed off by them.
23     Q. Do you believe that you were shown all of the
24 use-of-force forms from the time that you were deputy
25 chief in 2007 until you left?

Page 88

1      A. No.
2      Q. And do you believe that a form was filled out
3  every time a force was used that required the form to be
4  filled out?
5      A. No.
6      Q. And is there a time, a specific time, when the
7  officers are to fill out that form after the force is
8  used?
9      A. Normally when it would get filled out, the way
10 it should be done is once they complete their report,
11 the use-of-force form should be completed with it. The
12 report would go into our records division and the
13 use-of-force form is to be sent to our office. It
14 should be done by the end of their shift.
15     Q. Okay. And you mentioned earlier about packets
16 being put in mailboxes in the evening shift so that you
17 would get the paperwork when you arrived in the morning?
18     A. Yes.
19     Q. Was it routine that they were much larger
20 packets placed in Chief Newsome's mailbox than in yours?
21     A. I can't say if they were large or not, but he
22 would get packages placed in them.
23     Q. And he would get information regarding
24 incidences on different shifts that you were not
25 provided with?

Page 89

1      A. I believe that's -- to me I thought some of
2  that is what was contained. Normally, if anything
3  happened on any shift, it should have came straight to
4  me. He would have a lot of packages in his box that I
5  didn't have, so...
6      Q. And would you -- how many times per week was
7  Chief Newsome in the station on average?
8      A. I would say maybe two or three times a week.
9      Q. And in those two to three times a week that he
10 was there, how often would he stay?
11     A. Depending on if there was like a department
12 head meeting. If there was a department head meeting
13 upstairs, he would be there for a couple of hours. But
14 on a normal, I would say he would probably be there
15 maybe 15, 30, no longer than an hour.
16     Q. An hour per time, two to three times per week?
17     A. Yes.
18     Q. And is that why you had to put a lot of your
19 paperwork -- slide it under his door?
20     A. Yes.
21     Q. And would you classify him as being a hands-on
22 chief?
23     A. No.
24     Q. And what about -- do you have any opinions as
25 to the amount of vacations or the timing of Chief

Page 90

1  Newsome's vacations?
2    A.  I can't say about the amount of times of his
3  vacation.  I did notice that when certain situations
4  that were pretty bizarre or pretty rough that we would
5  have to deal with, he would conveniently go on vacation.
6       When we had the first incident where a Sergeant
7  Carter shot and killed a young man, the next day he left
8  and went out of town, conveniently had to go out of town
9  which was kind of messed up for me because I wasn't over
10 Sergeant Carter's unit at the time.  I didn't even know
11 they were working.  I had to pretty much deal with that
12 situation all by myself.
13   Q.  And that was a common occurrence, when there
14 was something negative --
15   A.  Whenever something really serious happened,
16 yeah, he conveniently went out of town.  Another
17 situation was when he fired our records and our dispatch
18 supervisor, there was a big meeting with the city
19 council that Monday.  He conveniently had to go out of
20 town for that.
21      Our HR director tried to call me and coach me
22 on what needed to be said at this particular meeting and
23 I wasn't aware these two young ladies were going to get
24 fired until the morning they were terminated.  I told
25 her that I thought it would be best that I not attend

Page 91

1  that meeting because I was tired of cleaning up after
2  Chief Newsome.  And that was just a couple of incidents.
3    Q.  The meeting -- you had talked about the
4  memorandum of understanding before, that you hadn't been
5  involved in the formulating of the memorandum of
6  understanding.
7       Did you, in fact, ask to attend that meeting?
8    A.  I believe I did ask to go and inquired as to
9  why.  He said him and Sergeant Wilson would take care of
10 it.  He was taking Wilson because Wilson was internal
11 and he would be the one doing the complaints on the
12 officers or something.  I don't know.
13   Q.  And, I mean, had you ever heard any -- are you
14 aware of anything regarding Officer Hartmann losing
15 prisoners or -- not prisoners, arrestees?
16   A.  No.  Movement of arrestees?
17   Q.  After someone's in custody, that they got away.
18   A.  Someone getting away.  Not that I recall, not
19 Hartmann.
20      MS. COLLISON:  I don't have anything else.
21      (Discussion held off the record.)
22 BY MS. COLLISON:
23   Q.  Two last questions.
24      The meeting that you had testified to earlier
25 that was supposed to take place between the chief and

Page 92

1  Valerie De'Vost regarding the incident with Shamecia
2  De'Vost and Mark Keske, do you recall that testimony?
3    A.  Yes.
4    Q.  Were you excluded from that meeting?
5    A.  Yeah.  He told me that he didn't need me, that
6  he would take care of the situation.
7    Q.  And did you have a meeting with Chief Newsome
8  on Sheridan Road?
9       (Reporter clarification.)
10      THE WITNESS:  S-h-e-r-i-d-a-n.
11      It was a week before I put in my retirement
12 letter.  He asked me to meet him down there.  When I got
13 down there, he was telling me that the city council
14 members and the mayor and HR and the chief of staff --
15 or slash chief of staff, they all was putting pressure
16 on him to fire me, to remove me, to switch me with
17 someone else.
18      And at that point I kind of exploded.  I told
19 him he can -- him, the mayor, and Angela and everybody
20 else that felt the need to remove me could remove me but
21 I said it a little worse than that.  I was tired of him
22 making those accusations.  Maybe we should have a
23 meeting with all of them.
24   Q.  Did he mention why they wanted to --
25   A.  I didn't ask.

Page 93

1    Q.  -- get rid of you?
2    A.  That was not the first time that Newsome had
3  told me that they wanted to get rid of me, he had said
4  that to me several times.  And at one point I asked him
5  to call a meeting with all of them so that I could see
6  for myself.
7       But when the incident happened where he
8  terminated the records and the dispatch supervisor and I
9  spoke to McCray, our HR/chief of staff, I told her that
10 Newsome had constantly told me that they all wanted to
11 get rid of me and she told me that that was a blatant
12 lie.
13      So when he called me down for this personal
14 meeting on Sheridan Road which was probably a week or so
15 later or within that time frame and he threatened that
16 they were putting pressure on him to get rid of me I
17 just told them to do what they had to do.  I was tired
18 of it.
19   Q.  And did you feel that that conversation was a
20 result of you complaining to Newsome and about Newsome?
21   A.  Yeah.  Because it had been -- I had been
22 constantly complaining to him.  I had also prior to that
23 told Angela about the -- the unfair discipline that he
24 was doing downstairs prior to that happening.
25      I told her that I felt that there was a morale

Page 94

1  problem; I told him I felt that there was a racial
2  problem, there was issues between -- I was afraid of an
3  eruption between the black and the white officers.  It
4  was getting pretty deep.  I spoke to Angela about that.
5         That was around the time I think Newsome had
6  conveniently went out of town again because of the
7  firing of the dispatcher and the records supervisor.
8         MR. O'CONNOR:  I just have a few more questions
9  for you.
10
11              EXAMINATION
12 BY MR. O'CONNOR:
13    Q.  Did you -- a lot of your complaints to the
14 chief that you've described, you put those in writing,
15 you'd do either an e-mail or do a memorandum or
16 something, correct?
17    A.  Right.
18    Q.  And those should have been kept or should be
19 kept somewhere you would hope, right?
20    A.  Yes.
21    Q.  You don't have copies of those yourself?
22    A.  No.
23    Q.  You didn't think about that?
24    A.  No, I did.  Actually on my computer, I put a
25 lot of that information on flash drives before I left

Page 95

1  because I had a feeling once I was gone that if
2  something serious happened, I would be blamed as usual.
3         My place flooded and I still had boxes and a
4  lot of my stuff got messed up.  The e-mails I called in
5  and inquired to Sergeant Wilson not too long ago just
6  to, you know, make sure, you know, in case I did have a
7  backup, hey, some of those blind CCs that I sent you, do
8  you have copies of them because I might need them.  And
9  he told me that the city system had crashed and that
10 they didn't have anything -- too much of anything left.
11    Q.  Did you have a fear that the city had actually
12 destroyed some of the records and got rid of some of the
13 records?
14    A.  When he told me that, I figured that's exactly
15 what they did.
16    Q.  Were you aware of any of that going on when you
17 were there?
18    A.  Prior to Ms. McCray getting there, there was
19 rumor -- after our initial HR director, Ms. Mozel, was
20 no longer with us, it was rumored that Chief Newsome and
21 them were seen upstairs in her office shredding a lot of
22 paper, him and the mayor was.  But I don't know what
23 paper it was, I don't know if it actually happened.  I
24 didn't see it myself.  Like I said, it's just rumors.
25    Q.  And when you say "rumors," this is people that

Page 96

1  worked for the city that was conveying that to you?
2     A.  Yes.
3     Q.  Again, they were reporting it to you with some
4  of the same people that trusted you and had a concern
5  about what they're observing within the department?
6     A.  Yes.
7     Q.  And your reaction to that is because it was the
8  higher level people, there really wasn't anything you
9  could do about it, right?
10    A.  Who do you go to?  If you go to Mayor
11 Rockingham, you might as well leave it alone.  What's
12 the point?
13    Q.  Had you ever gone to Mayor Rockingham on some
14 issues that you had or did you know given his
15 relationship with Chief Newsome that it wasn't any good?
16    A.  I told him just like I'm telling you guys, I
17 repeatedly talked to Newsome and all I was told by him
18 and anybody else is that things would change, but it
19 never did.
20        MR. O'CONNOR:  Okay.  That's all.
21        (Whereupon, the proceedings concluded at
22        2:30 p.m.)
23
24
25

Page 97

1            REPORTER'S CERTIFICATE
2  STATE OF NEVADA )
                   ) ss:
3  COUNTY OF CLARK )
4       I, Blanca I. Cano, CCR No. 861, RPR, do hereby
   declare:
5       That I reported the taking of the sworn
   statement of CRYSTAL PHILLIPS, commencing on Tuesday,
6  March 13, 2012.
7       That prior to being examined, the witness was
   by me duly sworn to testify the truth, the whole truth,
8  and nothing but the truth.
9       That I thereafter transcribed my said shorthand
   notes into typewriting and that the typewritten
10 transcript is a complete, true, and accurate
   transcription of my said shorthand notes, and that a
11 request has not been made to review the transcript.
12      I further certify that I am not a relative or
   employee of counsel, of any of the parties, nor a
13 relative or employee of the parties involved in said
   action, nor a person financially interested in the
14 action.
15      IN WITNESS WHEREOF, I have set my hand in my
   office in the County of Clark, State of Nevada, this
16 23rd day of March, 2012.
17
18      _____
        Blanca I. Cano, CCR No. 861, RPR
19
20
21
22
23
24
25